# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| PATRIOT EXPLORATION, LLC; JONATHAN FELDMAN; REDWING DRILLING PARTNERS; MAPLELEAF DRILLING PARTNERS; AVALANCHE DRILLING PARTNERS; PENGUIN DRILLING PARTNERS; and GRAMAX INSURANCE COMPANY LTD.<br><br>                     ***Plaintiffs***<br><br>          v.<br><br>SANDRIDGE ENERGY, INC.; SANDRIDGE EXPLORATION AND PRODUCTION, LLC; TOM L. WARD; MATTHEW K. GRUBB; RODNEY E. JOHNSON; EVERETT R. DOBSON; WILLIAM A. GILLILAND; DANIEL W. JORDAN; ROY T. OLIVER, JR.; JEFFREY S. SEROTA<br><br>                    ***Defendants*** | Case No.: _____<br><br><br>**COMPLAINT**<br><br><br>(Jury Trial Demanded) |

THE FLEISCHMAN LAW FIRM
 Keith M. Fleischman
 Hung G. Ta
 June H. Park
565 Fifth Avenue, Seventh Floor
New York, New York 10017

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

PARTIES ...........................................................................................................6

JURISDICTION AND VENUE ..............................................................................8

SUBSTANTIVE ALLEGATIONS ..........................................................................9

I.    TOM WARD ACQUIRES A STAKE IN SANDRIDGE...............................9

II.    SANDRIDGE FACED CRITICAL BUSINESS CHALLENGES
AT THE START OF 2009 ....................................................................10

III.    SANDRIDGE PROMOTES TO PLAINTIFFS THE OPPORTUNITY TO INVEST
IN DRILLING WELLS IN THE PINON GAS FIELD .................................13

IV.    IN ORDER TO INDUCE PLAINTIFFS TO INVEST IN DRILLING WELLS IN
THE PINON GAS FIELD, SANDRIDGE AND ITS OFFICERS DISSEMINATED
FALSE STATEMENTS AND OMITTED MATERIAL INFORMATION ...............14

A.  Defendants Deliberately And Repeatedly Inflated The Expected Rate Of Return
From SandRidge's Wells By Concealing The Impact Of Plant Shrink ..........................14

B.  Defendants Overstated The Average Reserves Of Net Methane Gas Per Well ..............15

C.  Defendants Deliberately And Repeatedly Inflated The Expected Rate Of Return From
SandRidge's Wells By Referring To Sale Prices For Methane Gas That Were Not
Applicable To The Gas From SandRidge's Wells ........................................................16

D.  Defendants Understated The Expenses Associated With Methane Production From
SandRidge's Wells ........................................................................................18

V.    SPECIFIC MISSTATEMENTS AND OMISSIONS ...................................19

A.  January 21, 2009................................................................................19

B.  March 3, 2009.....................................................................................20

C.  March 16, 2009...................................................................................21

D.  September 9, 2009..............................................................................24

E.  September 29-30, 2009.......................................................................25

F.  November 6, 2009 ..............................................................................25

i

VI.     BASED ON SANDRIDGE'S MISREPRESENTATIONS AND OMISSIONS,
        PLAINTIFFS ENTER INTO THE PARTICIPATION AGREEMENT........................26

VII.    THE WELLS DRILLED TO DATE UNDER THE PARTICIPATION
        AGREEMENT HAVE REVEALED THE EXTENT OF
        DEFENDANTS' FRAUD............................................................................................29

VIII.   PLAINTIFFS' CAPITAL COMMITMENTS AND OTHER
        EXPENDITURES UNDER THE PARTICPATION AGREEMENT .........................29

CAUSES OF ACTION ..................................................................................................................30

        FIRST CAUSE OF ACTION ...............................................................................30

        SECOND CAUSE OF ACTION ...........................................................................31

        THIRD CAUSE OF ACTION ...............................................................................33

        FOURTH CAUSE OF ACTION ...........................................................................34

        FIFTH CAUSE OF ACTION ...............................................................................35

        SIXTH CAUSE OF ACTION ...............................................................................36

        SEVENTH CAUSE OF ACTION .........................................................................37

        EIGHTH CAUSE OF ACTION ...........................................................................38

        NINTH CAUSE OF ACTION ...............................................................................39

        TENTH CAUSE OF ACTION ...............................................................................40

        ELEVENTH CAUSE OF ACTION ......................................................................41

        TWELFTH CAUSE OF ACTION.........................................................................42

        THIRTEENTH CAUSE OF ACTION ..................................................................43

PRAYER FOR RELIEF ...............................................................................................................44

Plaintiffs Patriot Exploration, LLC; Jonathan Feldman; Redwing Drilling Partners; Mapleleaf Drilling Partners; Avalanche Drilling Partners; Penguin Drilling Partners; and Gramax Insurance Company LTD., by their undersigned counsel, bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 15 U.S.C. § 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"); the Connecticut Uniform Securities Act ("CUSA"), C.G.S.A. §§ 36b-4 and 36b-29; Section 1-509 of the Oklahoma Uniform Securities Act of 2004 (the "OUSA"), 71 Okl. St. Ann., § 1-509; and the common law.  Plaintiffs make the allegations in this Complaint based upon personal knowledge as to matters concerning Plaintiffs and their own acts, and upon information and belief as to all other matters.

## INTRODUCTION

1.      This action concerns a fraud perpetrated by a multi-billion dollar public company, Defendant SandRidge Energy, Inc. ("SandRidge" or the "Company"), and certain senior members of its management.

2.      SandRidge is an independent oil and natural gas company headquartered in Oklahoma City, Oklahoma, and is listed on the New York Stock Exchange.  In early 2009, in the immediate aftermath of the financial crisis, SandRidge was struggling with critical business challenges.  Over the preceding two years, SandRidge had saddled itself with increasing debt, causing the Company to face an acute shortage of cash to finance its operations and meet contractual operations, including its exploration and drilling programs.

3.      Reflecting its precarious financial situation, in October 2008, SandRidge was forced to announce that it would slash its 2009 capital expenditure budget by half, from $2.0 billion to $1.0 billion.  In addition, SandRidge announced a cut to its production outlook.  In

response to these announcements, SandRidge's stock price declined 14 percent.  On December 16, 2008, SandRidge was forced to reduce its capital expenditure budget for 2009 once again, from $1 billion to $500 million.  Again, SandRidge's stock price declined in response to the news, falling more than 10% over the next two days.  All in all, SandRidge's stock price collapsed from over $60 per share in 2008 to under $5 per share by March 2009.

4.     With working capital drying up, SandRidge needed to find money to fund its exploration and drilling programs.  Given that SandRidge's reserves of natural gas and oil constituted the Company's only assets and, thus, only source of revenue, SandRidge needed to drill to stay in business.  But there were other reasons why it was necessary for SandRidge to maintain its drilling program.

5.     Under an agreement signed in 2008, SandRidge was obligated to deliver certain volumes of carbon dioxide gas ("$CO_2$") to another company, Occidental Petroleum Corp. ("Occidental").  $CO_2$ is a waste product of natural gas production, but can be used by companies such as Occidental to assist in the drilling and recovery of oil.  Thus, even though SandRidge was constrained financially in its ability to expend capital on exploration and drilling, the Company needed to maintain a certain level of natural gas drilling and production in order to meet its contractual commitments to supply certain volumes of $CO_2$ to Occidental.

6.     Moreover, SandRidge was in advanced discussions to sell Piñon Gathering Company, LLC ("PGC"), SandRidge's indirect wholly-owned subsidiary.  PGC owned and operated approximately 370 miles of gas gathering lines located in the same region where SandRidge conducted most of its gas exploration and drilling.  As the value of PGC was directly related to the amount of gas that it gathered, SandRidge was motivated to ensure a steady volume of gas from its wells through PGC's pipelines in order to extract the highest possible sale price

for PGC.  Indeed, under a sale agreement that was then being discussed, SandRidge would be required, after it sold PGC, to continue to deliver certain agreed-upon gas volumes through PGC's gathering system in order to ensure a guaranteed rate of return for the purchaser.

7.     Against this background, SandRidge looked to outside investors to inject money into the Company's exploration and drilling program.   In early 2009, senior officers of SandRidge, including the Company's Chief Executive Officer, Defendant Tom L. Ward ("Ward") and Chief Operating Officer, Defendant Matthew K. Grubb ("Grubb"), began discussing with certain of the Plaintiffs the possibility of an investment by Plaintiffs in SandRidge's natural gas drilling program.  As discussed by the parties, Plaintiffs would invest by participating in the Company's drilling program for the 2009 year.  Plaintiffs would pay a proportion of SandRidge's cost to drill wells for 2009, in return for a percentage of the revenues from those wells that were drilled.  In this manner, Plaintiffs' investment would allow SandRidge to keep drilling more wells, while allowing the Company to continue to meet its contractual obligations.

8.     The problem, as SandRidge and its senior officers knew, was that its wells had a high content of waste $CO_2$ gas and, combined with the depressed prices for natural gas then prevailing, would produce a loss for Plaintiffs.   Thus, to induce Plaintiffs to make their investments, SandRidge and its senior officers issued misleading statements and omitted material information that had the effect of overstating the expected returns from SandRidge's wells. These misstatements and omissions fell into at least four categories.

9.     *First*, SandRidge and its senior officers deliberately concealed the loss of natural gas during the treatment process, a process known as "plant shrink."  When natural gas is drawn from a well as "raw" or "wet" gas, it is mixed with $CO_2$ and other waste gases.  Thus, the raw

gas is treated to remove $CO_2$ before it can be distributed and sold.  In the course of treatment, natural gas is lost because some of the methane is used as fuel to run the treatment plant.  An additional amount of methane and other gases cannot be separated from the $CO_2$ and is irretrievably lost during the treatment process.  As Plaintiffs have now learned, the plant shrink historically experienced by SandRidge results in a reduction in the net amount of sellable methane gas so that just **25%** of the total raw gas is sellable.

10.     *Second*, and closely related to their failure to disclose plant shrink, SandRidge and its senior officers repeatedly overstated the amount of average reserves of methane gas per well for the wells that the Company had historically drilled.  Specifically, in numerous presentations and other communications, SandRidge represented that SandRidge had managed to increase the average reserves of raw gas in its drilled wells to 7.5 Bcfe (billion cubic feet of gas equivalent) per well, of which methane gas constituted approximately 3 Bcfe per well.  However, this figure of 3 Bcfe failed to take into account the effects of plant shrink.  After losses due to plant shrink, the net amount of methane gas for sale was only approximately 1.5 Bcfe, *half* the amount SandRidge touted.

11.     *Third*, in a further effort to conceal the negative impact of plant shrink, SandRidge and its senior officers repeatedly referred in their presentations and discussions to *final sale prices* for the methane gas (that is, prices at the pipeline or the point of sale to consumers), explicitly projecting internal rates of return which were based on these *final sale prices*.  By repeatedly doing this, SandRidge and its senior officers reinforced the fraudulent perception that all of the natural gas (including the amounts that should have been excluded to reflect plant shrink) was available for sale at the pipeline.  In fact, as SandRidge and its senior

offices knew, the natural gas could not be sold without first being treated, and the amount of natural gas would inevitably be reduced due to plant shrink during treatment.

12.     *Fourth*, SandRidge and its senior officers repeatedly understated the expenses associated with methane production from its wells.  For example, because the average reserves of sellable methane gas per well was only 1.5 Bcfe (not 3.0 Bcfe) out of the total volume of raw gas of 7.5 Bcfe, SandRidge effectively had to move a greater volume of non-sellable, waste gas through the pipelines (6.0 Bcfe as opposed to 4.5 Bcfe), resulting in a significant increase in the treatment and transportation costs associated with producing sellable methane gas.  Even more egregiously, SandRidge and its senior officers itemized for Plaintiffs ten different and distinct fees and expenses associated with gas production, but omitted the over-riding, most important economic factor – namely, loss of gas due to plant shrink.  Thus, when inputting the expected expenses into their own economic models, Plaintiffs were misled into believing that the expenses identified by SandRidge constituted the universe of expenses associated with gas production.

13.     Acting on the above misrepresentations and omissions, on May 5, 2009, Plaintiffs made their investment by entering into a Participation Agreement with a subsidiary of SandRidge (the "Participation Agreement").  As set forth below, pursuant to the Participation Agreement, Plaintiffs have now participated with SandRidge in the drilling of 25 wells.  Each of these wells has produced gas at levels that are a fraction of what Plaintiffs could have expected based on the representations by SandRidge and its senior officers.  None of these wells will recover the Plaintiffs' investment, much less make a profit, and Plaintiffs have suffered a loss on their entire investment due to Defendants' fraud.

## PARTIES

14.     Plaintiff Patriot Exploration, LLC ("Patriot") is an Alaskan limited liability company with its principal place of business at 15 Valley Drive, Third Floor, Greenwich, Connecticut 06831.

15.     Plaintiff Jonathan Feldman ("Feldman") is an individual residing at 200 Byram Shore Road, Greenwich, Connecticut 06830.

16.     Plaintiff Redwing Drilling Partners ("Redwing") is a Delaware general partnership with its principal place of business at Admiral Hill Office Park, 285 Commandants Way, Chelsea, Massachusetts 02150-4057.   The managing general partner of Redwing is Montcalm Co. LLC. ("Montcalm").

17.     Plaintiff Mapleleaf Drilling Partners ("Mapleleaf") is a Delaware general partnership with its principal place of business at Admiral Hill Office Park, 285 Commandants Way, Chelsea, Massachusetts 02150-4057.   The managing general partner of Redwing is Montcalm.

18.     Plaintiff Avalanche Drilling Partners ("Avalanche") is a Delaware general partnership with its principal place of business at Admiral Hill Office Park, 285 Commandants Way, Chelsea, Massachusetts 02150-4057.   The managing general partner of Redwing is Montcalm.

19.     Plaintiff Penguin Drilling Partners ("Penguin") is a Delaware general partnership with its principal place of business at Admiral Hill Office Park, 285 Commandants Way, Chelsea, Massachusetts 02150-4057.  The managing general partner of Penguin is Montcalm.

20.     Plaintiff Gramax Insurance Company LTD. ("Gramax") is a Nevis corporation with its principal place of business at 15 Valley Drive, Suite 3b, Greenwich, Connecticut 06831. Gramax is an entity wholly owned by Plaintiff Feldman.

21.     Defendant SandRidge is a Delaware corporation with its principal executive offices at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102.

22.     Defendant SandRidge Exploration and Production, LLC ("SandRidge Exploration") is a Delaware limited liability company with its principal place of business at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102.  Defendant SandRidge Exploration is a wholly-owned subsidiary of Defendant SandRidge.

23.     Defendant Ward is and was at all relevant times the Chairman of SandRidge's Board of Directors (the "Board") and the Chief Executive Officer of SandRidge.

24.     Defendant Grubb is and was at all relevant times President, Executive Vice President and Chief Operating Officer of SandRidge.

25.     Defendant Rodney E. Johnson ("Johnson") is and was at all relevant times Executive Vice President, Reservoir Engineering, of SandRidge.

26.     Defendant Everett R. Dobson ("Dobson") has been a director of SandRidge since September 24, 2009.  Dobson is a member of the Board's Audit Committee.

27.     Defendant William A. Gilliland ("Gilliland") has been a director of SandRidge since January 7, 2006.  Gilliland is a member of the Board's Audit Committee and Chairman of the Board's Compensation Committee.

28.     Defendant Daniel W. Jordan ("Jordan") has been a director of SandRidge since December 2005.  Jordan is a member of the Board's Compensation Committee and Nominating and Governance Committee.

29.     Defendant Roy T. Oliver, Jr. ("Oliver") has been a director of SandRidge since July 13, 2006.  Oliver is the Chairman of the Board's Nominating and Governance Committee and a member of the Board's Compensation Committee.

30.     Defendant Jeffrey S. Serota ("Serota") has been a director of SandRidge since March 20, 2007.

## JURISDICTION AND VENUE

31.     The claims asserted herein arise under, among other laws, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

32.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337(a) and 1367.

33.     Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391 as a substantial part of the events, acts or omissions giving rise to these claims occurred in this judicial district.  Certain of the Plaintiffs are located in the District of Connecticut, including Plaintiffs Patriot, Feldman and Gramax.  The misleading representations and omissions that are the subject of this action were directed and transmitted to this judicial district.  The Participation Agreement, by which Plaintiffs acquired their interests, was negotiated with Plaintiffs located in this judicial district.  Further, the Participation Agreement was signed by Patriot, which is located in this judicial district.

**SUBSTANTIVE ALLEGATIONS**

I.     **TOM WARD ACQUIRES A STAKE IN SANDRIDGE**

34.     SandRidge is an independent oil and natural gas company headquartered in Oklahoma City, Oklahoma, focusing on development and production activities on certain lands in West Texas and the Mid-Continent area of Oklahoma and Kansas.

35.     According to SandRidge's filings with the Securities and Exchange Commission ("SEC"), SandRidge's primary areas of focus in the West Texas region consist of the Permian Basin and the West Texas Overthrust (the "WTO").  The WTO in turn includes the Piñon gas field, a natural gas-prone region in Pecos County and Terrell County, Texas, where SandRidge claims to have approximately 501,100 net acres under lease.  According to SandRidge's SEC filings, the Piñon gas field accounted for 62.2% of the Company's proved reserve base as of December 31, 2008 and approximately 68% of SandRidge's 2008 exploration and development expenditures.  The Piñon gas field comprises several different reservoirs, the most prolific of which is the Warwick Caballos reservoir ("Warwick").

36.     SandRidge previously existed as Riata Energy, Inc. ("Riata"), an oil and natural gas company which began exploration and production operations in 1986 in West Texas.  In approximately June 2006, Defendant Ward purchased close to 29 million shares of common stock from Riata's founder, Malone Mitchell III, and other existing shareholders for $500 million at $17.25 per share.  As a result, Ward became the largest shareholder and joined Riata as Chief Executive Officer and Chairman of the Board.

37.     On December 29, 2006, Riata merged with and into a newly formed Delaware corporation in order to change its jurisdiction of incorporation from Texas to Delaware, and changed its name from "Riata Energy, Inc." to "SandRidge Energy, Inc."  Less than a year later,

on November 5, 2007, SandRidge conducted an initial public offering in which it raised $746.2 million by selling 28.7 million shares at a price of $26.

## II.     SANDRIDGE FACED CRITICAL BUSINESS CHALLENGES AT THE START OF 2009

38.     Despite its initial IPO success in 2007, SandRidge was confronted by major challenges by early 2009.  In the immediate aftermath of the financial crisis, SandRidge faced enormous financial constraints caused by a shortage of capital and increasing levels of indebtedness.

39.     When SandRidge conducted its IPO in 2007, it disclosed that it had total indebtedness of just $1.1 billion, representing approximately 43.6% of the Company's total capitalization.  As of December 31, 2008, total indebtedness had ballooned to $2.4 billion, representing approximately 75% of the Company's total capitalization.  In fact, the Company's debt was higher than the value of its proved reserves, which stood at only $2.2 billion as of December 31, 2008.  By the end of December 2009, SandRidge's total indebtedness had increased further to $2.6 billion, and the Company had to issue preferred stock outstanding with an aggregate liquidation preference of $465.0 million.  Reflecting its precarious financial situation, the Company's share price collapsed from over $60 per share in 2008 to under $5 per share by March 2009.

40.     Despite its shortage of working capital, SandRidge needed to continue its drilling and exploration program because its reserves of oil and gas were its only assets, and the Company needed to drill and produce gas or go out of business.  Furthermore, in late 2008 and early 2009, SandRidge still believed that the price for natural gas would rebound, and deliver healthy profits for the Company down the road.  But there were other reasons why the Company was motivated to continue its drilling program.

41.     On June 30, 2008, SandRidge announced that it had entered into a 30-year agreement with Occidental to develop a West Texas hydrocarbon gas processing plant (the "Century Plant") and related pipeline infrastructure.  Occidental agreed to fund the total expected project costs of $1.1 billion, while SandRidge would drill, produce and deliver high $CO_2$ content gas to the Century Plant.  Under the agreement, Occidental would operate the Century Plant and treat this gas, with SandRidge retaining 100% of the methane gas and Occidental retaining the $CO_2$ for use in Occidental's tertiary oil recovery in West Texas.  Importantly, the agreement committed SandRidge to deliver certain volumes of $CO_2$, with significant financial penalties in the event of any shortfall.  Because of the contractual commitment and the financial penalties, SandRidge was required to continue to outlay capital expenditures to drill for gas, a fact that was not lost on Defendant Ward and other senior officers at SandRidge.  For example, in announcing the Company's 2009 first quarter results on May 7, 2009, Ward stated:

> We have taken important steps during the last several months toward building the bridge between SandRidge's present and its future. In 2009, we have already raised approximately $350 million through the sale of preferred and common shares.  Also, we expect the sale of our WTO midstream assets and East Texas deep drilling rights to generate additional capital during the second quarter of 2009.  The proceeds realized with these transactions combined with cash flow generated from operations *will provide us with the strong balance sheet needed to fill Phase I of the Century Plant in 2010 and Phase II in 2011*.  (emphasis added)

42.     Furthermore, in the first half of 2009, SandRidge had entered into discussions to sell its indirect wholly-owned subsidiary, PGC, to TCW Energy.  PGC owned and operated approximately 370 miles of gas gathering lines located in the WTO in Pecos County, Texas, with an approximate throughput capacity in excess of 400 million cubic feet per day.  PGC's gathering system primarily served the Piñon gas field, the region where SandRidge conducted most of its gas exploration and drilling.  Because the value of PGC was directly related to the

amount of gas that it gathered, it was in SandRidge's interest to ensure a steady volume of gas from its wells through PGC's pipelines in order to extract the highest possible sale price for PGC.

43.     In fact, under the sale that SandRidge was then negotiating, SandRidge would be contractually obligated to continue to deliver certain gas volumes through PGC's gathering system in order to deliver a guaranteed rate of return to the purchaser.   On May 7, 2009, SandRidge disclosed that it had executed a letter of intent to sell PGC.   On June 30, 2009, SandRidge announced that it had sold PGC to TCW Energy.   As part of the sale, SandRidge Exploration entered into a "Gas Gathering Agreement" with PGC.   As disclosed by SandRidge, the Gas Gathering Agreement permitted PGC to "achieve[] a designated internal rate of return on its investment in the gathering system … .   In addition, prior to such time that [PGC] has achieved the designated internal rate of return, if the volumes that SandRidge [Exploration] delivers to [PGC] for gathering are less than certain minimum scheduled volumes, then, subject to certain exceptions for force majeure and breach by [PGC], SandRidge [Exploration] shall be obligated to make monthly shortfall payments to [PGC] to ensure that [PGC] receives the base fee it would have received if SandRidge had delivered the minimum scheduled volumes."

44.     As set forth below, all of these factors – a shortage of working capital, a depressed share price that made it expensive to raise capital through stock sales, as well as the need to keep exploring and drilling in order to stay in business, meet the contractual commitment to deliver $CO_2$ volumes to the Occidental's Century Plant and preserve the value of the PGC subsidiary in a sale – set the background for the discussions with Plaintiffs about a possible investment in SandRidge.   As set forth below, an investment deal with Plaintiffs would present

an ideal opportunity for SandRidge to minimize the cuts to its drilling program by accessing outside capital.

### III.   SANDRIDGE PROMOTES TO PLAINTIFFS THE OPPORTUNITY TO INVEST IN DRILLING WELLS IN THE PIÑON GAS FIELD

45.    U.S. Drilling Capital Management LLC ("USDCM") is an investment company that was organized for the purposes of identifying investment opportunities in the field of energy exploration, development and production.   Among other roles, USDCM's purpose was to identify investment opportunities on behalf of investors, including Plaintiffs, who would then provide the funding for the investments.   In return for its services, USDCM was to be paid a management fee, calculated based on the size of the investment, once the investment was concluded.

46.    Commencing in January 2009, representatives of USDCM, acting on behalf of the Plaintiffs, entered into discussions with SandRidge about the possibility of investing with SandRidge in the exploration and drilling of development wells within the Piñon gas field. Certain of the other Plaintiffs, including Patriot and Feldman, also participated directly in these discussions.

47.    On January 21, 2009, Defendant Ward proposed that USDCM participate with SandRidge in the exploration and development of the Piñon gas field by taking a share of SandRidge's drilling program in the Piñon field for 2009.   Ward represented that SandRidge had budgeted $600 million for drilling capital expenditure in the Piñon field for 2009, and offered USDCM an investment in the form of a 10% share of the 2009 drilling program, in return for rights to any oil and gas produced as a result of the capital expenditure.

48.    In the oil and gas industry, it is common for investors to participate in exploration and drilling programs on a "promoted basis" – that is, to invest in a certain percentage of the

drilling costs of each well, but to obtain a reduced percentage of the revenues from the well. Initially, Ward offered USDCM the opportunity to participate on "a third for a quarter" promoted basis – that is, USDCM would assume a third of the capital expenditures for each well and receive a quarter of the revenues.  At USDCM's request, however, SandRidge and Ward later agreed that USDCM could invest on a 25%/18.75% promoted basis – that is, to assume 25% of the capital expenditures in return for 18.75% of the revenues from each well.

## IV.    IN ORDER TO INDUCE PLAINTIFFS TO INVEST IN DRILLING WELLS IN THE   PIÑON GAS FIELD, SANDRIDGE AND ITS OFFICERS DISSEMINATED FALSE STATEMENTS AND OMITTED MATERIAL INFORMATION

49.    In the course of the parties' negotiations, SandRidge and its officers provided USDCM, Patriot and Feldman with access to various materials to assist them in conducting their due diligence of SandRidge's wells, including maps of the subject lands to be explored and drilled; presentations prepared by SandRidge; and economic projections.   These materials contained numerous representations that were intended to, and did in fact, induce Plaintiffs to make their investment.   These misleading statements and omissions fell into at least four categories.

### A.    Defendants Deliberately And Repeatedly Inflated The Expected Rate Of Return From SandRidge's Wells By Concealing The Impact Of Plant Shrink

50.    First, SandRidge deliberately concealed the fact of loss of methane gas due to "plant shrink."  "Plant shrink" represents the loss of methane gas during the process to treat the raw gas drawn from a well to remove $CO_2$.  Some of the methane is lost because it is used to run the treatment plant as fuel gas.  Additional methane and other gases cannot be separated from the $CO_2$ and is irretrievably lost during the treatment process.  As Plaintiffs have now learned, the plant shrink historically experienced by SandRidge results in a reduction in the net amount of sellable methane gas to just 25% of the total raw gas.

- 14 -

51.     Defendants were at all times aware of the effects of plant shrink.   As the Company disclosed in its Form 10-K for the year ended December 31, 2008, "Furthermore, when we treat the gas for the removal of $CO_2$, some of the methane is used to run the treatment plant as fuel gas and other methane and heavier hydrocarbons, such as ethane, propane and butane, cannot be separated from the $CO_2$ and is lost. ***This is known as plant shrink. Historically our plant shrink has been approximately 12% in the WTO. After giving effect to plant shrink, as many as 4 Mcf of high $CO_2$ natural gas must be produced to sell one MmBtu of natural gas.***" (emphasis added).

52.     SandRidge never disclosed the fact or the extent of plant shrink in any of the materials provided to, or communications with, USDCM and Plaintiffs.   To the contrary, SandRidge and its senior officers assured Plaintiffs that, apart from the 60% $CO_2$ that was required to be removed from the raw gas, Plaintiffs would not bear any other $CO_2$-related costs. This assurance was also reflected in the Participation Agreement.   Indeed, SandRidge deliberately and repeatedly inflated the expected rate of return from the gas wells by taking steps to hide the fact of plant shrink from USDCM and Plaintiffs.   Among other misconduct, SandRidge promoted its wells by providing USDCM and Plaintiffs with economic assumptions in which SandRidge explicitly maintained that the net sellable methane was 40% of the total raw gas.

**B.      Defendants Overstated The Average Reserves Of Net Methane Gas Per Well**

53.     Second, and related to the failure to disclose plant shrink, SandRidge repeatedly overstated the amount of its average reserves of methane gas per well.   Specifically, SandRidge repeatedly represented to Plaintiffs that SandRidge had increased its average reserves of raw/wet gas per well from an originally estimated 5.0 Bcfe (proved, undeveloped) to 7.0 Bcfe per well by

mid-2008, and to 7.5 Bcfe per well by the end of 2008.  At the same time, SandRidge repeatedly asserted that approximately 40% of the raw gas from each well, or 3 Bcfe, consisted of methane gas.

54.      These representations were false and misleading.  These representations omitted the effect of plant shrink, thereby significantly overstating the amount of reserves of net methane gas per well.  Including the effects of plant shrink, the average reserves of net methane gas per well has always been approximately 1.5 Bcfe per well.  By continually asserting to Plaintiffs that the Company had managed to increase reserves per well to 7.5 Bcfe, and that net methane gas comprised 40% of that amount, SandRidge therefore falsely represented that its average reserves of net methane gas per well were approximately *double* the actual amount.

### C.   Defendants Deliberately And Repeatedly Inflated The Expected Rate Of Return From SandRidge's Wells By Referring To Sale Prices For Methane Gas That Were Not Applicable To The Gas From SandRidge's Wells

55.      Third, in a further effort to conceal the negative impact of plant shrink, Defendants repeatedly referred to sale prices for the methane gas that were not relevant or applicable.  Specifically, when discussing the economics of SandRidge's wells, Defendants explicitly projected internal rates of return which were based on the application of *final sale prices at the pipeline* (that is, at the point of sale to consumers) to the purported 40% net sellable gas, thereby underscoring that *all of* this 40% of raw gas was available for sale at the pipeline.  In fact, as SandRidge knew, the 40% figure represented only the amount of natural gas before processing, and before reduction due to plant shrink.

56.      In this manner, Defendants misled Plaintiffs as to the projected rate of return by constantly switching the reference point.  When discussing the amount of reserves of gas that Patriot could expect, Defendants referred to the amount of gas before plant shrink (that is, the

40% of the raw gas from the well-head). But when discussing the price of the gas, Defendants referred to the gas price at the pipeline or point of sale, after plant shrink. By repeatedly switching the reference point, Defendants were able to inflate the expected rate of return. In addition, Defendants violated applicable SEC regulations and industry guidelines.

57. In its SEC filings, SandRidge measures its reserves based on the amount of net methane gas available for sale at the point of delivery to the pipeline. This is required by SEC Regulation S-X, 17 CFR Part 210.4-10 ("Financial Accounting And Reporting For Oil And Gas Producing Activities Pursuant To The Federal Securities Laws And The Energy Policy And Conservation Act Of 1975.") Specifically, Rule 4-10(a)(26), 17 CFR 210.4-10(a)(26) defines "reserves" as "estimated remaining quantities of oil and gas and related substances anticipated to be *economically producible*, as of a given date, by application of development projects to known accumulations." (emphasis added). Rule 4-10(a)(10), 17 CFR 210.4-10(a)(10), in turn defines "economically producible" to mean, as it relates to a resource, "a resource which generates revenue that exceeds, or is reasonably expected to exceed, the costs of the operation. The value of the products that generate revenue shall be determined at the *terminal point of oil and gas producing activities* as defined in paragraph (a)(16) of this section." (emphasis added). Instruction 1 to Rule 4-10(a)(16)(1), 17 CFR 210.4-10(a)(16)(1) explains that "[t]he oil and gas production function shall be regarded as ending at a 'terminal point', which is the outlet valve on the lease or field storage tank. If unusual physical or operational circumstances exist, it may be appropriate to regard the terminal point for the production function as [] [t]he *first point at which oil, gas, or gas liquids, natural or synthetic, are delivered to a main pipeline, a common carrier, a refinery, or a marine terminal* … ." (emphasis added).

- 17 -

58.     Similarly, the Petroleum Resources Management System released by the Society of Petroleum Engineers, the American Association of Petroleum Geologists, the World Petroleum Council and the Society of Petroleum Evaluation Engineers defines "reserves" to mean "those quantities of petroleum anticipated to be commercially recoverable by application of development projects to known accumulations from a given date forward under defined conditions. Reserves must further satisfy four criteria: they must be discovered, recoverable, commercial, and remaining (as of the evaluation date) based on the development project(s) applied in Section 3.2 ("Production Measurement")."   Section 3.2 in turn provides that "[i]n general, the marketable product, as measured according to delivery specifications at a defined Reference Point, provides the basis for production quantities and resources estimates. …   The Reference Point is typically the point of sale to third parties or where custody is transferred to the entity's downstream operations. Sales production and *estimated Reserves are normally measured and reported in terms of quantities crossing this point* … ." (emphasis added)

59.     In contrast to SandRidge's SEC disclosures, and unbeknownst to USDCM and Plaintiffs, the materials provided by SandRidge repeatedly measured the amount of reserves of methane gas at the well-head (*i.e.*, before plant shrink).  SandRidge then applied final sale prices at the pipeline to the gas from the well-head, even though this constituted raw, untreated gas not ready for sale.

### D.     Defendants Understated The Expenses Associated With Methane Production From SandRidge's Wells

60.     Fourth, by overstating average reserves per well and by omitting any disclosure of plant shrink, SandRidge also repeatedly understated the expenses associated with methane production from its wells.  As stated above, the increase from 5.0 Bcfe to 7.5 Bcfe of total raw gas per well claimed by SandRidge was entirely attributable to an increase in the $CO_2$ content

and other waste gases that were not sellable.   The amount of sellable methane gas always remained at approximately 1.5 Bcfe.   Accordingly, in order to extract the same 1.5 Bcfe of methane gas from each well, SandRidge in fact had to move a greater volume of non-sellable waste gas through the pipelines – 6.0 Bcfe, as opposed to 4.5 Bcfe, resulting in a significant increase in the costs of methane production.

61.   Indeed, SandRidge misled Plaintiffs through the manner by which SandRidge deliberately went about identifying and itemizing, in SandRidge's projections, all the fees and expenses that Plaintiffs should expect as part of gas production, but omitting any mention of the single, most critical economic factor – namely, loss of gas due to plant shrink.  Similarly, under Section 3.8 of the Participation Agreement, SandRidge identified various "treating fees" that were allocable to USDCM and Plaintiffs, thereby misleading Plaintiffs into believing that the treating fees identified in the Participation Agreement constituted the only expenses that Plaintiffs could expect to incur.  In other words, the manner in which expenses and fees were disclosed by SandRidge to Plaintiffs led Plaintiffs to believe that those constituted the entire universe of costs associated with gas production.

## V.     SPECIFIC MISSTATEMENTS AND OMISSIONS

62.   Set forth below are specific examples of the different categories, discussed above, of false and misleading statements and omissions by SandRidge to induce USDCM and Plaintiffs to invest with SandRidge in the drilling of wells in the Piñon gas field.

### A.     January 21, 2009

63.   On January 21, 2009, Defendant Ward emailed Phillip Epstein of USDCM, stating that: "***You know that we drill low finding cost areas and the Pinon Field Warwick Thrust has one of the best ROR in America***.  We reviewed vs information of all the best shale

plays and the Pinedale Anticline."   (emphasis added).   For the reasons set forth above, this statement was false, because the rate of return referenced by Ward failed to include the effects of plant shrink.

**B.     March 3, 2009**

64.     On March 3, 2009, SandRidge held an analyst conference at the Grand Hyatt Hotel, in New York, New York.   In the course of SandRidge's presentation, Defendant Ward discussed the partnership between SandRidge and Occidental to construct the Century Plant. According to Ward's presentation, "SandRidge will drill, produce and deliver high $CO_2$ gas to the Century Plant; Occidental will operate the Century Plant under a 30 year treating agreement." In a footnote, Ward added that the economics of the Century Plant "*[a]ssumes gas stream contains 65% CO2/35% methane and net of royalty.*" (emphasis added)   Ward therefore represented that the gas produced by SandRidge had a net methane content of 35%.   For the reasons set forth above, this statement was false, because this statement failed to include the effects of plant shrink.

65.     During the presentation, another SandRidge officer, Defendant Johnson, displayed a slide, entitled "Warwick Reserve Distribution (137 wells)", which purported to describe the reserve distribution for the Warwick reservoir.   In this slide, Johnson stated that SandRidge and/or its consultants had raised the estimated proved undeveloped reserves from 5.0 Bcfe to 7.0 Bcfe, and to 7.5 Bcfe by the end of 2008.   For the reasons set forth above, this statement was false, because it implied that the average reserves of net methane gas per well had also increased, when in fact they had not.   Furthermore, the statement violated SEC Regulation S-X and the guidelines set forth in the Petroleum Resources Management System, which both

provide that reserves are to be measured based on the amount of methane gas available for sale at the pipeline.

66.     In another slide, entitled "Premier Continental United States Plays", Johnson purported to compare, among other things, the estimated ultimate recovery, the capital expenditure and the rate of return of the Warwick reservoir with other gas producing properties in the continental United States.  Johnson stated that the rate of return for Warwick was 26%, the highest of the five gas producing properties compared on the slide.  For the reasons set forth above, this statement was false, because the projected rate of return was based on incorrect assumptions as to the amount of methane gas available for sale, and failed to take into account reductions due to plant shrink.  The statement also contravened SEC Regulation S-X and the guidelines set forth in the Petroleum Resources Management System, which both provide that reserves are to be measured based on the amount of methane gas available for sale at the pipeline.  Lastly, the projected rate of return was false because, by failing to include the effects of plant shrink, it understated the expense associated with the production of methane.

**C.     March 16, 2009**

67.     On March 16, 2009, SandRidge uploaded, and provided USDCM and Patriot with access to, a package of documents posted on an external file transfer protocol ("FTP") site.

68.     One of the documents uploaded by SandRidge on to the FTP site was a presentation entitled "Reservoir – Rodney E. Johnson, Executive Vice President – Reservoir Engineering."   This presentation incorporated multiple slides that contained material misstatements and omissions.

69.     Defendant Johnson's presentation incorporated two slides – "Warwick Reserve Distribution (137 wells)" and "Premier Continental United States Plays" – that were previously

used in SandRidge's March 3, 2009 analyst conference presentation.  For the reasons already discussed above, these slides contained material and false statements concerning the increases in SandRidge's estimated proved undeveloped reserves, the estimated ultimate recovery, the capital expenditure and the rate of return for wells in the Warwick reservoir compared with other gas producing properties in the continental United States.

70.     In a third slide, entitled "Warwick Spacing Study", Johnson repeated the false and misleading misrepresentations that the average methane gas reserves per well had increased from 5.0 Bcfe to 7.0 Bcfe by mid-2008, and to 7.5 Bcfe by the end of 2008.

71.     In a fourth slide, entitled "Economic Assumptions", Johnson set forth a series of detailed assumptions underlying SandRidge's projections.  According to Johnson, one of the economic assumptions used by SandRidge was that the "methane content" of the raw gas extracted from the well-head was 44.81%.  That is, SandRidge represented that this was the *net* amount of gas that would be available for sale *at the pipeline*.  SandRidge's statement was not susceptible of any other interpretation because SandRidge used the 44.81% figure to calculate the projected rate of return of 26%, thereby indicating that the 44.81% methane content was the actual amount of gas available for sale.[1]  To underscore that the 44.81% methane content was the actual amount of methane available for sale, SandRidge applied the sale price of natural gas *at the pipeline* to calculate the rate of return of 26%.  Specifically, in its analysis of the economics of the proposed wells, SandRidge referred to the "Nymex Strip" price as of February 18, 2009.

72.     Further, Defendant Johnson included numerous additional, detailed assumptions in the slide.  For example, Johnson assumed certain adjustments, such as a downward adjustment of $1.08 per Mcfe to account for a "differential to Nymex" and an adjustment to reflect "BTU

---

[1]       In the slide entitled "Premier Continental United States Plays", SandRidge stated that the estimated ultimate recovery per well was 7.507 Bcfe.  SandRidge then multiplied this figure by 44.81% to arrive at an average figure of 3.360 Bcfe of gas (3,360 MMBTU of energy) per well, generating a rate of return of 26%.

adjustment for fuel." Johnson also included detailed assumptions as to various expenses, such as a gross operational expenditures per well per month of $1750 (comprising such costs as the costs for transportation and compression) and "plugging costs" to be incurred after the well reaches the end of its productive life. Not only were these assumptions that investors would typically expect in projections, the deliberate inclusion of such detailed assumptions had the effect of reinforcing the rigorousness and, therefore, the reliability of SandRidge's projections. For the reasons stated above, however, the projections were grossly misleading because they omitted any reference to plant shrink.

73.     In a second document uploaded by SandRidge on to the FTP site, entitled "Reserves and Economics", SandRidge purported to provide a summary of the economic returns (on a per well basis) of the proposed investment from Plaintiffs' perspective. The document was misleading in various material respects, in that the document inflated the average reserves of net methane gas per well; omitted any reference to plant shrink; and inflated the rate of return from SandRidge's wells.

74.     Specifically, in the "Reserves and Economics" document, Defendants projected that the "gross gas production" (raw gas production) from each well would be "7,496.639 MMcfe", or approximately 7.5 Bcfe. Defendants then falsely represented that, of this approximate 7.5 Bcfe of gross gas production, 55.2% was $CO_2$, and that 45.8% was methane gas available for sale. Using this incorrect figure of 45.8% methane gas content, and based on the assumption that Plaintiffs' initial interest was 18.726% in each well, Defendants represented that the "net gas production" from each well attributable to Plaintiffs' 18.726% interest would be 0.629108 Bcfe (approximately, 7.496639 Bcfe multiplied by 0.458 multiplied in turn by 0.18726). In this manner, Defendants failed to further adjust the 45.8% methane gas content for

the effects of plant shrink.  Defendants proceeded to reinforce the misleading 45.8% figure by projecting the expected rate of return using the Nymex strip price for natural gas as of February 18, 2009 – that is, the final sale price at the pipeline, implying that all of the 45.8% methane gas was available for sale.

75.    Based on the Nymex natural gas strip price as of February 18, 2009, SandRidge projected that Patriot's investment would produce for Patriot an operating income of $2,408,039; net cash flow of $1,468,539; a rate of return of 16.66%; and a present value of $303,431.[2]  In fact, as Plaintiffs have subsequently learned from an independent report produced by a third party consultant, Ancell Energy, if plant shrink had been taken into account, Patriot's investment would have produced net operating income of only $1,739,461; net cash flow of **negative $250,856**; and a present value of **negative $586,543**.

**D.    September 9, 2009**

76.    On September 9, 2009, SandRidge participated in a "CEO Energy Conference" hosted by Barclays.  In the course of the conference, SandRidge gave a presentation in which it discussed the Warwick reservoir in the Piñon gas field.  In a slide entitled "Premier Continental United States Plays", SandRidge represented that the estimated ultimate recovery of raw gas from each well in the Warwick reservoir was 7.518 Bcfe, and that the estimated ultimate recovery of net natural gas from each well was 3.018 Bcfe.  In another slide, entitled "Type Curve Comparison", SandRidge used these same incorrect figures in comparing the Warwick wells with the wells from other gas producing reservoirs.  According to SandRidge, the average 3.018 Bcfe of net natural gas produced by the Warwick wells was more than twice the next highest reserves of 1.442 Bcfe net natural gas from wells in the "Dug Out Creek" reservoir.  For

---

[2]    The present value was based on estimated gas revenues, net of estimated direct expenses, and discounted at an annual discount rate of 10%.

the reasons stated above, the statements contained in the September 9, 2009 presentation were false and misleading because they vastly overstated the average reserves of net methane gas per well.  In fact, the average reserves of net methane gas per well was always approximately 1.5 Bcfe, or approximately half the amount claimed by SandRidge.

       **E.**      **September 29-30, 2009**

      77.    On September 29-30, 2009, SandRidge conducted a presentation at the Deutsche Bank Leveraged Finance Conference in Scottsdale, Arizona.  In this presentation, SandRidge included a slide, entitled "Premier Continental United States Plays", in which SandRidge represented that the Warwick reservoir compared favorably with other continental U.S. reservoirs because it produced a rate of return of 26%, based on an estimated ultimate recovery of $7.511 Bcfe raw gas per well; methane content of 3.004 Bcfe, or 39.99%; and a capital expenditure of $2.212 million.  For the reasons stated above, these representations were false and misleading, because they failed to take into account plant shrink.

       **F.**      **November 6, 2009**

      78.    On November 6, 2009, during SandRidge's 2009 third quarter earnings conference call, Defendant Ward stated that "Everything within the Warwick Thrust is continuing to be exactly as we have stated. ***It's basically 7.5 Bcf per well and anticipated 62% CO2 content and the per-well economics have stayed the same***. We don't anticipate changing those."  (emphasis added).  For the reasons stated above, these statements were false and misleading, because they overstated the reserves of methane gas per well and because they failed to take into account plant shrink.

## VI. BASED ON SANDRIDGE'S MISREPRESENTATIONS AND OMISSIONS, PLAINTIFFS ENTER INTO THE PARTICIPATION AGREEMENT

79. On May 5, 2009, based on the representations and omissions made by SandRidge (as set forth in greater detail in Sections IV and V above), USDCM and Patriot entered into the Participation Agreement.

80. Under the Participation Agreement, USDCM and Patriot agreed to participate in SandRidge's 2009 drilling program by committing up to $75,000,000 (seventy-five million dollars) towards the cost of drilling and completing wells ("Participation Wells") on certain lands owned or leased by SandRidge within the Piñon field. The $75,000,000 capital commitment was to be funded in three tranches: a first tranche of $15,000,000; a second tranche of $30,000,000 and a third tranche of $30,000,000. Each tranche would be used to fund a distinct set of Participation Wells.

81. With respect to the first tranche, $10,000,000 was payable immediately on the signing of the Participation Agreement, with the balance to be paid as the wells were drilled. With respect to the second and third tranches, the parties agreed that USDCM and Patriot would have the right, but not the obligation, to fund those tranches.

82. Under the Participation Agreement, USDCM and Patriot's participation would be made on a 25%/18.75% promoted basis. That is, they would fund 25% of the costs associated with drilling each of the Participation Wells, and if the Participation Well was completed and was capable of producing oil and gas, SandRidge would assign to USDCM and Patriot 18.75% of the working interest (revenues) in such well (defined in the Participation Agreement as the "Earned Interest" in that Participation Well).

83. As the Participation Agreement reflected, although USDCM and Patriot were the signatories to the Participation Agreement, the parties acknowledged that USDCM and Patriot

were acting on behalf of other investors (the Plaintiffs) in entering into the Participation

Agreement, and intended that USDCM and Patriot would proceed to parcel out their interests

under the Participation Agreement to the various Plaintiffs through a series of assignments.

Thus, in Section 6.3 of the Participation Agreement, SandRidge Exploration required USDCM

and Patriot to represent that:

> (i) [USDCM and Patriot ] [are] acquiring such oil and gas interests
> for [their] own account ***and/or the account of a partnership which
> Montcalm Co. LLC ("Montcalm") is the managing general
> partner***, for investment purposes only, and not with a view to the
> resale or distribution thereof, (ii) ***each of USD[CM], Patriot,
> Montcalm and any such partnership of which Montcalm is the
> managing general partner*** is an "accredited investor" as defined
> in Regulation D under the Securities Act of 1933, as amended, and
> (iii) ***each of USD[CM], Patriot, Montcalm and any such
> partnership of which Montcalm is the managing general partner***
> has sufficient knowledge and experience in financial and business
> matters so as to be capable of evaluating the merits and risks of
> entering into this Agreement and acquiring the oil and gas interests
> to be acquired hereunder.  (emphasis added)

84.     Further, Section 9.17 ("Successors and Assigns") of the Participation Agreement

provided that "This Agreement shall be binding upon and inure to the benefit of the Parties and

their respective successors and permitted assigns."

85.     Accordingly, and consistent with the intention of the parties, on the same day

(May 5, 2009) that USDCM and Patriot entered into the Participation Agreement, USDCM

assigned to Patriot the interest of USDCM in the first tranche of capital expenditures under the

Participation Agreement.  Thus, as of May 5, 2009, Patriot held the entire interest to the first

tranche of capital expenditures under the Participation Agreement.  Subsequently, between May

16 and October 9, 2009, Patriot in turn proceeded to parcel out its interest in the first tranche to

the other Plaintiffs through a series of assignments.  These assignments were made over a period

of several months, as each new Participation Well was drilled, and was approved by SandRidge in each case.

86.     As a result of the assignments described above, the original interest of USDCM and Patriot under the Participation Agreement has now been assigned to Plaintiffs Feldman, Redwing, Mapleleaf, Avalanche, Penguin and Gramax in the following shares:

| Plaintiff | Percentage Share of First Tranche |
|-----------|-----------------------------------|
| Feldman | 16.67% |
| Redwing: | 23.86% |
| Mapleleaf | 26.04% |
| Avalanche | 24.18% |
| Penguin | 4.26% |
| Gramax | 5.00% |

87.     By entering into the Participation Agreement, SandRidge achieved several objectives at the same time.  Under the Participation Agreement, SandRidge found an outside investor to inject capital into the Company's drilling program, thus allowing the Company to develop its reserves of oil and gas.  As Ward stated on SandRidge's 2009 first quarter earnings conference call conducted on May 8, 2009, "We also have announced a drilling deal with a private company to bring forward reserves in the Piñon field. This anticipated 75 million of drilling will generate approximately 19 million carried interest drilling net to SandRidge that is *additive to our CapEx budget*. In other words, *it brings forward reserves that we could not get to for many years.*" (emphasis added).  At the same time, the Company could continue to produce high volumes of $CO_2$ gas to meet its contractual obligations with respect to Occidental's

Century Plant.  Furthermore, the continued gas volumes drilled and delivered to the PGC's gathering network allowed SandRidge to sell PGC at favorable prices to TCW Energy.

## VII.   THE WELLS DRILLED TO DATE UNDER THE PARTICIPATION AGREEMENT HAVE REVEALED THE EXTENT OF DEFENDANTS' FRAUD

88.     To date, Plaintiffs have participated in the drilling of twenty-five (25) wells as part of the first tranche of capital expenditures under the Participation Agreement.  Twenty-three (23) were completed as gas wells.

89.     The production results so far from the 25 wells reveal Defendants' fraudulent scheme.  The 23 gas wells are producing at rates that are approximately 30% of the levels that would be expected based on the pre-drill estimates calculated according to the information provided by Defendants, and the costs are approximately double pre-drill estimates.  Also, based on the results so far, it is clear that the estimated ultimate recovery for all 25 wells drilled by SandRidge will be substantially below the levels that would be expected based on pre-drill estimates calculated according to the information provided by SandRidge.

90.     As a consequence of the poor results from the first tranche and the revelation of Defendants' fraud, Plaintiffs have declined to participate in the second or third tranches of capital expenditures under the Participation Agreement.

## VIII.  PLAINTIFFS' CAPITAL COMMITMENTS AND OTHER EXPENDITURES UNDER THE PARTICIPATION AGREEMENT

91.     As required by the Participation Agreement, concurrently with the execution of the Participation Agreement, on May 7, 2009, Patriot sent a wire transfer to SandRidge in the amount of $10,000,000.00, representing an advance on the first tranche of USDCM and Patriot's capital commitment.

92.     On October 8, 2009, in reliance on SandRidge's continuing misrepresentations and omissions, Plaintiffs sent another wire transfer to SandRidge in the amount of $2,500,000. On October 29, 2009, in reliance on SandRidge's continuing misrepresentations and omissions, Plaintiffs sent a further wire transfer to SandRidge in the amount of $1,000,000.

93.     In addition, Plaintiffs have expended additional amounts in the form of audit expenses and other expenses.   In total, Plaintiffs have expended close to $15 million in connection with their investment under the first tranche of the Participation Agreement.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)
### (Asserted Against Defendants SandRidge, SandRidge Exploration, Ward, Grubb and Johnson)

94.     Plaintiffs re-allege each and every allegation above as if fully set forth herein.

95.     This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against Defendants SandRidge, SandRidge Exploration, Ward, Grubb and Johnson (collectively, the "Section 10(b) Defendants").

96.     By acquiring their interests under the Participation Agreement, Plaintiffs purchased securities for purposes of the Exchange Act.

97.     The Section 10(b) Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

98.     By engaging in the above conduct, the Section 10(b) Defendants induced Plaintiffs to enter into the Participation Agreement.

99.     The Section 10(b) Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

100.    Plaintiffs entered into the Participation Agreement and acquired their securities without knowledge that the Section 10(b) Defendants had misstated or omitted material facts.  In acquiring their securities, Plaintiffs relied directly or indirectly on the false and misleading statements and omissions made by the Section 10(b) Defendants.

101.    Plaintiffs would not have entered into the Participation Agreement and acquired their securities had they known the truth about the matters discussed above.

102.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, and Plaintiffs' reliance on the Section 10(b) Defendants' false statements and misrepresentations and omissions of material facts, Plaintiffs have suffered damages in connection with their acquisition of their securities under the Participation Agreement.

103.    By virtue of the foregoing, the Section 10(b) Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## SECOND CAUSE OF ACTION
### (Violation of Connecticut Uniform Securities Act. C.G.S.A. §§ 36b-4 and 36b-29(a))
### (Asserted Against Defendants SandRidge, SandRidge Exploration,
### Ward, Grubb and Johnson)

104.    Plaintiffs re-allege each and every allegation above as if fully set forth herein.

105.    This claim is brought under Section 36b-4 and 36b-29(a), C.G.S.A. §§ 36b-4 and 36b-29(a), against Defendants SandRidge, SandRidge Exploration, Ward, Grubb and Johnson (collectively, the "Section 36b-29(a) Defendants").

106.    By acquiring their interests under the Participation Agreement, Plaintiffs purchased securities for purposes of the CUSA.

107.    The Section 36b-29(a) Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs, in violation of Section 36b-29(a) of the CUSA.

108.    The Section 36b-29(a) Defendants sold, or materially aided in the sale, to Plaintiffs of the interests in the Participation Agreement, and induced Plaintiffs to enter into the Participation Agreement, by making untrue statements of material facts, omitting to state other facts necessary to make the statements made not misleading, and/or concealing material facts, in violation of Section 36b-29(a) of the CUSA.

109.    The Section 36b-29(a) Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein; acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them; deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading; and/or, in the exercise of reasonable care, should have known of the untrue statements and omissions.

110.    Plaintiffs entered into the Participation Agreement and acquired their securities without knowledge that the Section 36b-29(a) Defendants had misstated or omitted material

facts.   In acquiring their securities, Plaintiffs relied directly or indirectly on the false and misleading statements and omissions made by the Section 36b-29(a) Defendants.

111.    Plaintiffs would not have entered into the Participation Agreement and acquired their securities had they known the truth about the matters discussed above.

112.    As a direct and proximate result of the Section 36b-29(a) Defendants' wrongful conduct, and Plaintiffs' reliance on the Section 36b-29(a) Defendants' false statements and misrepresentations and omissions of material facts, Plaintiffs have suffered damages in connection with their acquisition of their securities under the Participation Agreement.

113.    By virtue of the foregoing, the 36b-29(a) Defendants have violated Section 36b-29(a) of the CUSA.

### THIRD CAUSE OF ACTION
**(Violation of Oklahoma Uniform Securities Act of 2004, Section 1-509(B))**
**(Asserted Against Defendants SandRidge, SandRidge Exploration,**
**Ward, Grubb and Johnson)**

114.    Plaintiffs re-allege each and every allegation above as if fully set forth herein.

115.    This claim is brought under Section 1-509(B) of the OUSA, 71 Okl. St. Ann., § 1-509(B), against Defendants SandRidge, SandRidge Exploration, Ward, Grubb and Johnson (collectively, the "Section 1-509(B) Defendants").

116.    By acquiring their interests under the Participation Agreement, Plaintiffs purchased securities for purposes of the OUSA.

117.    The Section 1-509(B) Defendants induced Plaintiffs to enter into the Participation Agreement by making untrue statements of material facts, omitting to state other facts necessary to make the statements made not misleading, and/or concealing material facts, in violation of Section 1-509(B) of the OUSA.

118.   The Section 1-509(B) Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein; acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them; deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading; and/or, in the exercise of reasonable care, should have known of the untrue statements and omissions.

119.   Plaintiffs entered into the Participation Agreement and acquired their securities without knowledge that the Section 1-509(B) Defendants had misstated or omitted material facts. In acquiring their securities, Plaintiffs relied directly or indirectly on the false and misleading statements and omissions made by the Section 1-509(B) Defendants.

120.   Plaintiffs would not have entered into the Participation Agreement and acquired their securities had they known the truth about the matters discussed above.

121.   As a direct and proximate result of the Section 1-509(B) Defendants' wrongful conduct, and Plaintiffs' reliance on the Section 1-509(B) Defendants' false statements and misrepresentations and omissions of material facts, Plaintiffs have suffered damages in connection with their acquisition of their securities under the Participation Agreement.

122.   By virtue of the foregoing, the Section 1-509(B) Defendants have violated Section 1-509(B) of the OUSA.

### FOURTH CAUSE OF ACTION
### (Common Law Fraud/Fraudulent Inducement)
### (Asserted Against Defendants SandRidge, SandRidge Exploration, Ward, Grubb and Johnson)

123.   Plaintiffs re-allege each and every allegation above as if fully set forth herein.

- 34 -

124.     This claim is for common law fraud/fraudulent inducement against Defendants SandRidge, SandRidge Exploration, Ward, Grubb and Johnson (collectively, the "Common Law Fraud Defendants").

125.     The Common Law Fraud Defendants induced Plaintiffs to enter into the Participation Agreement by making untrue statements of material facts, omitting to state other facts necessary to make the statements made not misleading, and/or concealing material facts.

126.     Each of the Common Law Fraud Defendants knew their representations and omissions were false and/or misleading at the time they were made.  Each of the Common Law Fraud Defendants made the misleading statements with an intent to defraud Plaintiffs.

127.     Plaintiffs justifiably relied on the Common Law Fraud Defendants' false representations and misleading omissions.

128.     Plaintiffs would not have entered into the Participation Agreement and acquired their securities had they known the truth about the matters discussed above.

129.     As a result of the Common Law Fraud Defendants' false and misleading statements and omissions, Plaintiffs have suffered damages in connection with their acquisition of their securities under the Participation Agreement.

**FIFTH CAUSE OF ACTION**
**("Officer" and "Director" Liability Under CUSA, § 36b-29(c))**
**(Asserted Against Defendants Ward, Grubb,**
**Johnson, Dobson, Gilliland, Jordan, Oliver and Serota)**

130.     Plaintiffs re-allege each and every allegation above as if fully set forth herein.

131.     This claim is brought pursuant to Section 36b-29(c) of the CUSA, C.G.S.A. § 36b-29(c), against Defendants Ward, Grubb, Johnson, Dobson, Gilliland, Jordan, Oliver and Serota (collectively, the "Section 36b-29(c) D&O Defendants").

132.    As set forth above, SandRidge is liable under Section 36b-29(a) of the CUSA, C.G.S.A. § 36b-29(a).

133.    Each of the Section 36b-29(c) D&O Defendants is an officer or director of SandRidge.  Each of the Section 36b-29(c) D&O Defendants knew, or in the exercise of reasonable care should have known, of the existence of the misconduct giving rise to SandRidge's liability under Section 36b-29(a) of the CUSA.  Amongst other matters, by virtue of their positions, the Section 36b-29(c) D&O Defendants reviewed or had the opportunity to review the materials and information disseminated by SandRidge to induce Plaintiffs to enter into the Participation Agreement, and therefore knew or should have known that the materials and information contained misrepresentations and omissions.

134.    Accordingly, pursuant to Section 36b-29(c) of the CUSA, C.G.S.A. § 36b-29(c), the Section 36b-29(c) D&O Defendants are liable jointly and severally with and to the same extent as SandRidge.

## SIXTH CAUSE OF ACTION
### (Liability Under OUSA, § 1-509(G)(2))
### (Asserted Against Defendants Ward, Grubb, Johnson, Dobson, Gilliland, Jordan, Oliver and Serota)

135.    Plaintiffs re-allege each and every allegation above as if fully set forth herein.

136.    This claim is brought pursuant to Section 1-509(G)(2) of the OUSA, 71 Okl. St. Ann., § 1-509(G)(2), against Defendants Ward, Grubb, Johnson, Dobson, Gilliland, Jordan, Oliver and Serota (collectively, the "Section 1-509(G)(2) Defendants").

137.    As set forth above, SandRidge is liable under Section 1-509(B) of the OUSA, 71 Okl. St. Ann., § 1-509(B).

138.    Each of the Section 1-509(G)(2) Defendants is an executive officer or director of SandRidge.  Each of the Section 1-509(G)(2) Defendants knew, or in the exercise of reasonable

care should have known, of the existence of the misconduct giving rise to SandRidge's liability under Section 1-509(B) of the OUSA.  Amongst other matters, by virtue of their positions, the Section 1-509(G)(2) Defendants reviewed or had the opportunity to review the materials and information disseminated by SandRidge to induce Plaintiffs to enter into the Participation Agreement, and therefore knew or should have known that the materials and information contained misrepresentations and omissions.

139.    Accordingly, pursuant to Section 1-509(G)(2) of the OUSA, 71 Okl. St. Ann., § 1-509(G)(2), the Section 1-509(G)(2) Defendants are liable jointly and severally with and to the same extent as SandRidge.

**SEVENTH CAUSE OF ACTION**
**(Liability Under Section 20(a) of the Exchange Act)**
**(Asserted Against Defendants Ward, Grubb,**
**Johnson, Dobson, Gilliland, Jordan, Oliver and Serota)**

140.    Plaintiffs re-allege each and every allegation above as if fully set forth herein.

141.    This cause of action is brought pursuant to Section 20(a) of the Exchange Act against Defendants Ward, Grubb, Johnson, Dobson, Gilliland, Jordan, Oliver and Serota (collectively, the "Section 20(a) Defendants").

142.    Each of the Section 20(a) Defendants by virtue of its control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a control person of the Section 10(b) Defendants within the meaning of Section 20(a) of the Exchange Act.

143.    As a result of their control of the Section 10(b) Defendants, the Section 20(a) Defendants reviewed or had the opportunity to review the materials and information disseminated by the Section 10(b) Defendants to induce Plaintiffs to enter into the Participation Agreement, and therefore knew or should have known that the materials and information

contained misrepresentations and omissions.  The Section 20(a) Defendants could have prevented the issuance of the misleading materials and information or caused them to be corrected.  As a result, the Section 20(a) Defendants did not act in good faith.

144.    As set forth above, the Section 10(b) Defendants each violated Section 10(b) of the Exchange act and Rule 10b-5 promulgated thereunder.  By virtue of their positions as control persons, the Section 20(a) Defendants are jointly and severally liable pursuant to Section 20(a) of the Exchange Act.

145.    As a direct and proximate result of the Section 20(a) Defendants' wrongful conduct, Plaintiffs suffered damages in connection with the acquisition of their securities under the Participation Agreement.

**EIGHTH CAUSE OF ACTION**
**("Control" Liability Under CUSA, § 36b-29(c))**
**(Asserted Against Defendants Ward, Grubb,**
**Johnson, Dobson, Gilliland, Jordan, Oliver and Serota)**

146.    Plaintiffs re-allege each and every allegation above as if fully set forth herein.

147.    This cause of action is brought pursuant to Section 36b-29(c) of the CUSA, C.G.S.A. § 36b-29(c), against Defendants Ward, Grubb, Johnson, Dobson, Gilliland, Jordan, Oliver and Serota (collectively, the "Section 36b-29(c) Control Defendants").

148.    Each of the Section 36b-29(c) Control Defendants by virtue of its control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a control person of the Section 36b-29(a) Defendants within the meaning of Section 36b-29(c) of the CUSA.

149.    Each of the Section 36b-29(c) Control Defendants knew, or in the exercise of reasonable care should have known, of the existence of the misconduct giving rise to the Section 36b-29(a) Defendants' liability.  Amongst other matters, as a result of their control of the Section

36b-29(a) Defendants, the Section 36b-29(c) Control Defendants reviewed or had the opportunity to review the materials and information disseminated by the Section 36b-29(a) Defendants to induce Plaintiffs to enter into the Participation Agreement, and therefore knew or should have known that the materials and information contained misrepresentations and omissions.  The Section 36b-29(c) Control Defendants could have prevented the issuance of the misleading materials and information or caused them to be corrected.

150.    Accordingly, pursuant to Section 36b-29(c) of the CUSA, C.G.S.A. § 36b-29(c), the Section 36b-29(c) Control Defendants are liable jointly and severally with and to the same extent as the Section 36b-29(a) Defendants.

### NINTH CAUSE OF ACTION
#### (Liability Under OUSA, § 1-509(G)(1))
#### (Asserted Against Defendants Ward, Grubb, Johnson, Dobson, Gilliland, Jordan, Oliver and Serota)

151.    Plaintiffs re-allege each and every allegation above as if fully set forth herein.

152.    This cause of action is brought pursuant to Section 1-509(G)(1) of the OUSA against Defendants Ward, Grubb, Johnson, Dobson, Gilliland, Jordan, Oliver and Serota (collectively, the "Section 1-509(G)(1) Defendants").

153.    Each of the Section 1-509(G)(1) Defendants by virtue of its control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a control person of the Section 1-509(B) Defendants within the meaning of Section 1-509(G)(1) of the OUSA.

154.    Each of the Section 1-509(G)(1) Defendants knew, or in the exercise of reasonable care should have known, of the existence of the misconduct giving rise to the Section 1-509(B) Defendants' liability.  Amongst other matters, as a result of their control of the Section 1-509(B) Defendants, the Section 1-509(G)(1) Defendants reviewed or had the opportunity to

review the materials and information disseminated by the Section 1-509(B) Defendants to induce Plaintiffs to enter into the Participation Agreement, and therefore knew or should have known that the materials and information contained misrepresentations and omissions.  The Section 1-509(G)(1) Defendants could have prevented the issuance of the misleading materials and information or caused them to be corrected.

155.    Accordingly, pursuant to Section 1-509(G)(1) of the OUSA, 71 Okl. St. Ann., § 1-509(G)(1), the Section 1-509(G)(1) Defendants are liable jointly and severally with and to the same extent as the Section 1-509(B) Defendants.

**TENTH CAUSE OF ACTION**
**("Aiding" Liability Under CUSA, § 36b-29(c))**
**(Asserted Against Defendants Ward, Grubb and Johnson)**

156.    Plaintiffs re-allege each and every allegation above as if fully set forth herein.

157.    This cause of action is brought pursuant to Section 36b-29(c) of the CUSA, C.G.S.A. § 36b-29(c), against Defendants Ward, Grubb, Johnson, Dobson, Gilliland, Jordan, Oliver and Serota (collectively, the "Section 36b-29(c) Aiding Defendants").

158.    Each of the Section 36b-29(c) Aiding Defendants was an employee of Defendant SandRidge.   Each of the Section 36b-29(c) Aiding Defendants materially aided in the misconduct giving rise to SandRidge's liability under Section 36b-29(a) of the CUSA.  Amongst other matters, by virtue of their positions at SandRidge, including their positions as supervisors directly overseeing the conduct of SandRidge and its negotiations with Plaintiffs, the Section 36b-29(c) Aiding Defendants reviewed or had the opportunity to review the materials and information disseminated by SandRidge to induce Plaintiffs to enter into the Participation Agreement.   The Section 36b-29(c) Aiding Defendants failed to prevent the issuance of the misleading materials and information and/or failed to cause them to be corrected.

159.    By virtue of the above matters, the Section 36b-29(c) Aiding Defendants knew or should have known that materials and information contained misrepresentations and omissions. Each of the Section 36b-29(c) Aiding Defendants knew, or in the exercise of reasonable care should have known, of the existence of the misconduct giving rise to SandRidge's liability under Section 36b-29(a) of the CUSA.

160.    Accordingly, pursuant to Section 36b-29(c) of the CUSA, C.G.S.A. § 36b-29(c), the Section 36b-29(c) Aiding Defendants are liable jointly and severally with and to the same extent as SandRidge.

### ELEVENTH CAUSE OF ACTION
**(Liability Under OUSA, § 1-509(G)(5))**
**(Asserted Against Defendants Ward, Grubb,**
**Johnson, Dobson, Gilliland, Jordan, Oliver and Serota)**

161.    Plaintiffs re-allege each and every allegation above as if fully set forth herein.

162.    This cause of action is brought pursuant to Section 1-509(G)(5) of the OUSA against Defendants Ward, Grubb, Johnson, Dobson, Gilliland, Jordan, Oliver and Serota (collectively, the "Section 1-509(G)(5) Defendants").

163.    Each of the Section 1-509(G)(5) Defendants materially aided in the misconduct giving rise to the Section 1-509(B) Defendants' liability.  Amongst other matters, by virtue of their positions at SandRidge, including their positions as supervisors directly overseeing the conduct of the Section 1-509(B) Defendants and the negotiations with Plaintiffs, the Section 1-509(G)(5) Defendants reviewed or had the opportunity to review the materials and information disseminated by the Section 1-509(B) Defendants to induce Plaintiffs to enter into the Participation Agreement.  The Section 1-509(G)(5) Defendants failed to prevent the issuance of the misleading materials and information and/or failed to cause them to be corrected.

164.    By virtue of the above matters, the Section 1-509(G)(5) Defendants knew or should have known that materials and information contained misrepresentations and omissions. Each of the Section 1-509(G)(5) Defendants knew, or in the exercise of reasonable care should have known, of the existence of the misconduct giving rise to the Section 1-509(B) Defendants' liability under Section 1-509(B) of the OUSA.

165.    Accordingly, pursuant to Section 1-509(G)(5) of the OUSA, 71 Okl. St. Ann., § 1-509(G)(5), the Section 1-509(G)(5) Defendants are liable jointly and severally with and to the same extent as the Section 1-509(B) Defendants.

### TWELFTH CAUSE OF ACTION
### (Common Law Aiding And Abetting Fraud)
### (Asserted Against Defendants Ward, Grubb,
### Johnson, Dobson, Gilliland, Jordan, Oliver and Serota)

166.    Plaintiffs re-allege each and every allegation above as if fully set forth herein.

167.    This cause of action for aiding and abetting under the common law is asserted against Defendants Ward, Grubb, Johnson, Dobson, Gilliland, Jordan, Oliver and Serota (collectively, the "Aiding and Abetting Defendants").

168.    The Aiding and Abetting Defendants provided the Common Law Fraud Defendants with substantial assistance in perpetrating the fraud. Amongst other matters, by virtue of their positions at SandRidge, including their positions as supervisors directly overseeing the conduct of the Common Law Fraud Defendants and the negotiations with Plaintiffs, the Aiding and Abetting Defendants reviewed or had the opportunity to review the materials and information disseminated by the Common Law Fraud Defendants to induce Plaintiffs to enter into the Participation Agreement. The Aiding and Abetting Defendants failed to prevent the issuance of the misleading materials and information and/or failed to cause them to be corrected.

- 42 -

169.   By virtue of the above matters, the Aiding and Abetting Defendants knew or should have known that the materials and information contained misrepresentations and omissions.  The Aiding and Abetting Defendants therefore knew of the fraud perpetrated by the Common Law Fraud Defendants.

170.   As a direct and natural result of the fraud committed by the Common Law Fraud Defendants, and the knowing and active participation by the Aiding and Abetting Defendants, Plaintiffs have suffered substantial damages.

### THIRTEENTH CAUSE OF ACTION
### (Negligent Misrepresentation)
### (Asserted Against Defendants SandRidge, Ward, Grubb and Johnson)

171.   Plaintiffs re-allege each and every allegation above as if fully set forth herein.

172.   This cause of action for negligent misrepresentation is brought against Defendants SandRidge, Ward, Grubb and Johnson (the "Negligent Misrepresentation Defendants").  This cause of action is asserted in the alternative to the causes of action set forth above.

173.   Each of the Negligent Misrepresentation Defendants owed a duty of care to Plaintiffs.

174.   The Negligent Misrepresentation Defendants breached their duty to Plaintiffs by making untrue statements of material facts.

175.   In making the material misrepresentations of fact referred to above, the Negligent Misrepresentation Defendants intended to induce Plaintiffs to rely on those misrepresentations in entering into the Participation Agreement.   The Negligent Misrepresentation Defendants expected that Plaintiffs would rely on those misrepresentations in deciding whether to enter into the Participation Agreement.

176.     When     the     Negligent     Misrepresentation     Defendants     made     these misrepresentations, they had no reasonable ground for believing them to be true.

177.     Plaintiffs reasonably and justifiably relied on the misrepresentations described above in analyzing and deciding to enter into the Participation Agreement.  Had the Negligent Misrepresentation Defendants not made the false and misleading representations, Plaintiffs would not have entered into the Participation Agreement.

178.     When Plaintiffs entered into the Participation Agreement, Plaintiffs did not know about the untrue and misleading statements alleged herein.

179.     As a direct and proximate result of the negligent misrepresentations made by the Negligent Misrepresentation Defendants, Plaintiffs were damaged in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, as follows:

1.     For rescission;

2.     For an award of compensatory damages against Defendants in favor of Plaintiffs for damages sustained as a result of Defendants' wrongdoing;

3.     For an award of punitive damages as permitted by common law and statute;

4.     For an award to Plaintiffs of its costs and disbursements in this suit, including reasonable attorney's fees and expert fees; and

5.     For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated: August 4, 2011

/s/ Joseph W. Martini
WIGGIN & DANA LLP
  Joseph W. Martini
Two Stamford Plaza
281 Tresser Boulevard
Stamford, Connecticut  06901
Tel:    (203) 363-7603
Fax:    (203) 363-7676
Federal Bar. No. CT-07225


THE FLEISCHMAN LAW FIRM
  Keith M. Fleischman
  Hung G. Ta
  June H. Park
565 Fifth Avenue, Seventh Floor
New York, New York 10017

*Counsel for Plaintiffs*



BARRETT LAW GROUP, P.A.
  Don Barrett
404 Court Square North
Lexington, Mississippi 39095-0927

*Of Counsel*